**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ERIN WOOD and BRITTIAN WARNER, individually, and on behalf of all others similarly situated, |
| Plaintiffs, |
| v. |
| NURTURE, INC., |
| Defendant. |

CASE NO. 1:21-cv-3159

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

### Introduction

Plaintiffs Erin Wood and Brittian Warner, individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendant Nurture, Inc. for its negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence of dangerous substances in its baby food sold throughout the United States. Plaintiffs seek injunctive and monetary relief on behalf of the proposed classes (defined below). Plaintiffs allege the following based upon personal knowledge, investigation of counsel, and information and belief:

### Nature of the Action

1.     Parents, like Plaintiffs, trust manufacturers, like Defendant, to sell baby food that is safe, nutritious, and free from harmful toxins, contaminants, and chemicals. They certainly expect the food they feed their infants and toddlers to be free from arsenic, cadmium, lead, and mercury (collectively, "**Heavy Metals**"), which are substances known to have significant and dangerous health consequences for their young children.

2.     It would be unreasonable for consumers to develop the knowledge necessary to determine whether Defendant's products contain dangerous levels of Heavy Metals, or to test each

product for presence of Heavy Metals.  That is why reasonable consumers, like Plaintiffs, rely upon Defendant and baby food manufacturers to honestly report and disclose what is contained in the products they sell to consumers.

3.     A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("**House Report**"), reveals that consumers' trust has been violated.[1]  The Subcommittee's investigation of the seven largest baby food manufacturers in the United States, which included Defendant, was prompted by "reports alleging high levels of toxic heavy metals in baby foods."  Ex. 1 at 2. The Food and Drug Administration ("**FDA**") and the World Health Organization ("**WHO**") have declared the Heavy Metals to be "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.  Even low levels of exposure can cause serious and often irreversible damage to brain development." *Id.*

4.     According to the House Report, Defendant is the only baby food manufacturer, out of the seven investigated, that regularly tests its baby food products for inorganic arsenic levels. *Id.* at 13.  However, and what is most troubling, is the fact that Defendant "**routinely sold products that exceeded its internal standards**," and "**over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb.**" *Id.* at 14 (emphasis added).

5.     Defendant knows that its customers trust the quality of its products and that they expect Defendant's products to be free of Heavy Metals.  It also knows that many consumers seek out and wish to purchase premium baby foods that possess high quality ingredients and free of

---

[1] A true and correct copy of the House Report is attached hereto as **<u>Exhibit 1</u>**.

toxins, contaminants, or chemicals and that consumers will pay more for baby foods they believe possess these qualities than for baby foods that they do not believe possess these qualities.

6.      As such, Defendant represents, warrants, markets, and advertises its baby food as possessing certain qualities, including premium and healthy qualities, that justify a premium price. In fact, Defendant's brand of baby food that contains dangerous levels of Heavy Metals is called "Happy Baby."

7.      No reasonable consumer seeing Defendant's products or advertising would expect to find Heavy Metals, or other undesirable toxins or contaminants, in the baby food.  Defendant's placement of these Heavy Metals in its products is a material fact that is knowingly withheld from consumers, and baby food being free from harmful contaminants is at the center of consumers' purchasing decision.

8.      Defendant intended for consumers to rely upon in its marketing, advertising, and labeling of its products, and reasonable consumers did in fact so rely.  However, Defendant's marketing and labeling is deceptive, misleading, unfair, and/or false because, *inter alia*, its baby foods include dangerous levels of Heavy Metals, which Defendant's knowingly fails to disclose to the consuming public.

9.      Defendant's baby foods do not have a disclaimer regarding the presence of Heavy Metals or other undesirable toxins or contaminants that would inform consumers that the foods contain Heavy Metals.  Of course, this would lead to no reasonable consumer purchasing its products, as Heavy Metals can accumulate over time in a child's body to the point where poisoning, injury, and/or disease can occur.

10.      Defendant's material omissions and deceptive business practices allowed it to capitalize upon, and reap enormous profits from, consumers who paid the purchase price, and even

a price premium, for the baby foods containing Heavy Metals, which was not sold as advertised. Defendant continues to sell, and wrongfully induces consumers to purchase, its baby foods containing dangerous levels of Heavy Metals.

11.     Plaintiffs bring this consumer class action individually, and on behalf of all other class members, who purchased for use, and not for resale, any of Defendant's baby foods containing dangerous levels of Heavy Metals.

JURISDICTION & VENUE

12.     Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), this Court has original jurisdiction over this action because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a State different from Defendant.

13.     Venue is proper in this judicial district because it is where Defendant resides.  28 U.S.C. § 1391(b)(1).

PARTIES

14.     Plaintiff Erin Wood is, and at all times relevant hereto has been, a citizen of the state of Texas.  She purchased Defendant's baby foods containing dangerous levels of Heavy Metals from 2018 to 2021 for her children, specifically: Happy Baby Apple & Broccoli Puffs; Happy Baby Purple Carrot & Blueberry Puffs; Happy Baby Kale & Spinach Puffs; Happy Baby Sweet Potato & Carrot Puffs; Happy Baby Strawberry & Beet Puffs; Happy Baby Organic Greek Yogis, Blueberry & Purple Carrot; and Happy Baby Blueberry Purple Carrot Teether.  She purchased these products from Whole Foods and Market Street grocers in Colleyville, Texas.

15.     Plaintiff believed that she was feeding her children healthy, nutritious foods.  Due to Defendant's false and misleading claims and omissions, however, she was unaware that these

products contained any level of Heavy Metals and would not have purchased the products or would have paid less for them if that information had been disclosed or otherwise been made known to her.

16.     Plaintiff Brittian Warner is, and at all time relevant hereto has been, a citizen of the state of Indiana.  He purchased Defendant's baby foods containing dangerous levels of Heavy Metals from 2018-2019 for his daughter, specifically: Happy Baby Purple Carrot & Blueberry Puffs; Happy Baby Banana & Pumpkin Puffs; Happy Baby Blueberry Beet Rice Cakes; Happy Baby Apple Rice Cakes; and Happy Baby Sweet Potato & Banana Cakes.  He purchased these products from Target, Meijer, and Kroger grocers in Indianapolis, Indiana.  Due to Defendant's false and misleading claims and omissions, he was unaware that these products contained any level of Heavy Metals and would not have purchased the products or would have paid less for them if that information had been disclosed or otherwise been made known to him.

17.     As a result of Defendant's negligent, reckless, and/or knowing deceptive conduct, as alleged herein, Plaintiffs were injured when they paid the purchase price or a price premium for Defendant's products that contain Heavy Metals, which were sold to them despite Defendant's knowledge that these products contain dangerous levels of Heavy Metals.  Plaintiffs paid for the products under the assumption that they did not contain harmful and dangerous Heavy Metals and that the products were safe for their children to ingest.  Plaintiffs would not have paid for these products at all had they known that Defendant's products contain dangerous and excessive levels of Heavy Metals.  Further, Plaintiffs would be unable to rely on the truthfulness of the marketing, advertising, and labeling of Defendant's products absent corrective changes to the products themselves and to the labeling and advertising of the products.

18.     Defendant Nurture, Inc. is a Delaware corporation with its principal place of business located at 40 Fulton St., 17th FL, New York, NY 10038.  Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells its baby foods containing Heavy Metals under the Happy Baby name throughout the United States.  Defendant may be served with process through its registered agent c/o Corporate Creations Network Inc., 600 Mamaroneck Ave., Ste. 400, Harrison, New York 10528.

**FACTUAL ALLEGATIONS**

**I.     A Congressional Investigation Found the Presence of Heavy Metals in Baby Foods**

19.     On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its finds that "significant levels" of Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in numerous commercial baby food products.  *See generally* Ex. 1.

20.     Defendant was one of the baby food manufactures from whom the Subcommittee requested internal documents and test results.  The internal documents and test results produced by Defendant are disturbing.

**A.  Inorganic Arsenic**

21.     "Arsenic is ranked number one among substances present in the environment that pose the most significant potential health threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry" ("**ATSDR**"). Ex. 1 at 10.  "The known health risks of arsenic exposure include 'respiratory, gastrointestinal, haematological [sic], hepatic, renal, skin, **neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children**." *Id.* (emphasis original).

22.     The House Report notes that, while "no established safe level of inorganic arsenic consumption for babies" exists, "[o]rganizations such as Healthy Babies Bright Futures have called for a goal of no measurable amount of inorganic arsenic in baby food[;] Consumer Reports suggests setting inorganic arsenic levels as low as 3 parts per billion (ppb)[; the] FDA has already set maximum inorganic arsenic levels at 10 ppb for bottled water"; and the Environmental Protection Agency ("**EPA**"), the European Union, and the WHO have all "set a 10 ppb inorganic arsenic cap on drinking water." *Id.* at 13.

23.     Moreover, the FDA issued guidance in August 2020 entitled, "Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance for Industry" ("**2020 FDA Guidance**").[2]  This guidance finalizes the approach presented in the draft guidance, published in the Federal Register (81 FR 19976) by the FDA on April 6, 2016, entitled "Inorganic Arsenic in Rice Cereals for Infants: Action Level," and the accompanying supporting document and risk assessment report. Ex. 2 at 4.  The 2016 draft guidance recommended an action level for inorganic arsenic in rice cereals for infants of 100 ppb, based upon the serious health risks presented by long-term exposure to inorganic arsenic in rice and rice products.  *See* 81 Fed. Reg. 19976, 19977 (Apr. 6, 2016), *available at* https://www.federalregister.gov/documents/2016/04/06.

24.     The 2020 FDA Guidance "provides information to manufacturers on the action level for inorganic arsenic in rice cereals for infants . . . that is intended to help protect public health by reducing infants' dietary exposure to inorganic arsenic and is achievable by industry with the use of current good manufacturing practices."  Ex. 2 at 3.

25.     According to the FDA, "inorganic arsenic is generally considered more toxic than organic arsenic," and "[c]onsumption of inorganic arsenic has been associated with cancer, skin

---

[2] A true and correct copy of the 2020 FDA Guidance is attached hereto as **Exhibit 2**.

lesions, cardiovascular disease and diabetes in humans." *Id.* at 4. "Rice and rice products are a greater potential source of dietary inorganic arsenic exposure for infants and children that for adults, because the dietary patterns of infants and children are often less varied than those of adults, and because infants and children consumer more food relative to their body weight than do adults." *Id.* at 5.

26.     Further, the 2020 FDA Guidance and House Report agree that "infants and children may be particularly susceptible to adverse neurodevelopmental effects of exposure to inorganic arsenic." *Id.*; Ex. 1 at 2. Indeed, "[t]he qualitative component of the risk assessment concluded that exposure to inorganic arsenic during pregnancy, infancy, and early childhood may increase the risk of neurodevelopmental toxicity and/or adverse pregnancy outcomes." Ex. 2 at 6.

27.     The 2020 FDA Guidance set the action level for inorganic arsenic in infant rice cereals at 100 ppb, which is the same level at which Defendant set its internal threshold for inorganic arsenic in infant rice cereals. *Id.*; Ex. 1 at 14.

**B.  Defendant's products contain dangerous levels of inorganic arsenic.**

28.     Although Defendant is the only baby food manufacturer out of the seven investigated that tests finished products for inorganic arsenic content, Defendant's internal documents show that it "sells products even after testing confirms that they are dangerously high in inorganic arsenic." Ex. 1 at 14. Defendant's sold its Apple & Broccoli Puffs, which was purchased by Plaintiff Wood and various members of the proposed class, despite its own "test results showing it contained 180 ppb inorganic arsenic." *Id.* According to the House Report, an "**arsenic level of 180 ppb is high by all standards, but it is 80% higher than Nurture's own internal goal threshold of 100 ppb**." *Id.* (emphasis added).

29.    Even more disconcerting is that Defendant routinely sold baby food that exceeded 100 ppb of inorganic arsenic.  "Twenty-nine other products Nurture tested and sold registered over 100 ppb inorganic arsenic.  In total, over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb."

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[36]

| Product Name | Goal Threshold | Result | Date of Test Report | Disposition |
|---|---|---|---|---|
| Apple & Broccoli Puffs | 100 | 180 | 11/01/17 | Sell |
| Banana & Pumpkin Puffs | 100 | 160 | 10/31/17 | Sell |
| Strawberry & Beet Puffs | 100 | 160 | 10/31/17 | Sell |
| Kale & Spinach Puffs | 100 | 150 | 10/31/17 | Sell |
| Kale & Spinach Puffs | 100 | 150 | 10/31/17 | Sell |
| Purple Carrot & Blueberry Puffs | 100 | 150 | 11/17/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 150 | 10/31/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 150 | 10/31/17 | Sell |
| Apple Rice Cakes | 100 | 130 | 02/08/17 | Sell |
| Apple Rice Cakes | 100 | 130 | 02/08/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 122 | 09/13/18 | Sell |
| Apple Rice Cakes | 100 | 120 | 02/08/17 | Sell |

| Blueberry Beet Rice Cakes | 100 | 120 | 02/08/17 | Sell |
| Purple Carrot & Blueberry Puffs | 100 | 120 | 10/31/17 | Sell |
| Apple & Broccoli Puffs | 100 | 115 | 10/15/18 | Sell |
| Strawberry & Beet Puffs | 100 | 114 | 03/21/19 | Sell |
| Purple Carrot & Blueberry Puffs | 100 | 112 | 06/05/18 | Sell |
| Apple Rice Cakes | 100 | 110 | 07/28/17 | Sell |
| Blueberry Beet Rice Cakes | 100 | 110 | 02/08/17 | Sell |
| Blueberry Beet Rice Cakes | 100 | 110 | 02/08/17 | Sell |
| Strawberry & Beet Puffs | 100 | 108 | 12/10/18 | Sell |
| Strawberry & Beet Puffs | 100 | 108 | 09/21/18 | Sell |
| Apple & Broccoli Puffs | 100 | 107 | 05/30/19 | Sell |
| Strawberry & Beet Puffs | 100 | 107 | 05/22/19 | Sell |
| Strawberry & Beet Puffs | 100 | 105 | 09/21/18 | Sell |
| Strawberry & Beet Puffs | 100 | 104 | 08/22/18 | Sell |
| Banana & Pumpkin Puffs | 100 | 103 | 04/24/19 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 103 | 04/24/19 | Sell |
| Banana & Pumpkin Puffs | 100 | 101 | 09/21/18 | Sell |

*Id.* at 14-15.

30.    Over 78% of the products Defendant tested and sold had 90 ppb inorganic arsenic or above, demonstrating that a majority of Defendant's products exceeded the inorganic arsenic threshold set by the FDA, EPA, EU, and WHO for drinking water.  *Id.* at 13, 15.  It is unclear whether any of Defendant's products contain no inorganic arsenic, as recommended by Healthy Babies Bright Futures, or inorganic arsenic levels below 3 ppb, as suggested by Consumer Reports, because Defendant's products that test below 9.54 ppb inorganic arsenic are all marked as "<9.54." *Id.* at 15.

31.    The inorganic arsenic levels in Defendant's products pose an unreasonable risk of harm to toddlers' and infants' neurodevelopment.  Studies have concluded that the negative effect posed by arsenic "is most pronounced in Full Scale IQ": "For every 50% increase in arsenic levels, there is an approximately '0.4% decrease in the IQ of children.'"  *Id.* at 10; *see also id.* ("A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water

with an arsenic concentration level greater than 5 parts per billion (ppb) 'showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores.' The authors pegged 5 ppb as an important threshold."); *id.* at 15 (over 78% of Defendant's tested products had 9 ppb inorganic arsenic or above, and the products tested averaged 59.54 ppb).

### C. Lead

32.    "Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Even small doses of lead exposure are hazardous, particularly to children." Ex. 1 at 11. Exposure to lead is associated with behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to the FDA, lead is especially dangerous to 'infants' and 'young children.'" *Id.*

33.    The House Report cites two studies that found a strong inverse relationship between lead exposure and poor test scores, and various studies have established a significant association between lead exposure and Attention-Deficit/Hyperactive Disorder. *Id.* at 11-12. Another study found that the cognitive effects associated with lead exposure appear to be permanent. *Id.* at 11.

34.    The American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports have all, in some form, called for a 1 ppb lead level in food and drinks that babies and children consume. *Id.* at 21. While baby food has no federal standard for lead, the FDA, WHO, and EPA have set standards and guidelines of 5, 10, and 15 ppb for lead in drinking water, respectively. *Id.* Additionally, the EU has set the maximum lead level in infant formula at 20 ppb. *Id.*

### D. Defendant's products contain dangerous levels of lead.

35.    Defendant's internal standard for lead in its products is 100 ppb, which is 20 times higher than the FDA's standard for bottled water, 10 times higher than the WHO's guideline for

drinking water, and more than 6 times higher than the EPA's action level for drinking water.  Ex. 1 at 21-22

36.    Again, Defendant was the only baby food manufacturer out of the seven investigated in the House Report that routinely tests its finished products for lead, and again **Defendant sold finished baby food products after testing confirmed that they contained as much as 641 ppb lead**.  *Id.* at 22.  That product was Defendant's Blueberry Purple Carrot Teether, which Plaintiff Wood and various other class members purchased.

### Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)[55]

| Product Name | Category | Best Before Date | Param eter | Goal Thresh old | Result | Unit | Date of Test Report | Dispos ition |
|---|---|---|---|---|---|---|---|---|
| Blueberry Purple Carrot | Baby 7+ Months | 10/25/2017 | Lead | 100 | 641 | ppb | 01/27/17 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Lead | 100 | 500 | ppb | 09/30/17 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Apple Spinach Kiwi Cre | Baby 7+ Months | 8/4/2018 | Lead | 100 | 86 | ppb | 07/08/17 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Blueberry Beet Rice Ca | Baby 7+ Months | 6/22/2018 | Lead | 100 | 61 | ppb | 07/09/17 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 10/24/2019 | Lead | 100 | 55 | ppb | 12/12/18 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 05/07/2019 | Lead | 100 | 50 | ppb | 12/12/18 | Set - Testing For Monitoring & Supply Chain Improvement Purposes Only |

*Id.* at 23.

37.    Of the 206 products tested by Defendant, 16 registered over 20 ppb lead, 39 registered over 10 ppb lead, and it is unclear whether any of Defendant's products registered at or below 1 ppb lead, which should be the upper limit according to health experts.  *Id.*

## II.    Defendant's Representations on Its Products are Misleading and Deceptive

38.    Plaintiffs, and parents in general, seek to purchase food for their children that is healthy and nutritious.  Plaintiffs and class members rely upon the labeling of food products that they purchase for their children to ensure that the food is nutritious and supportive of their children's physical and neurological development.

39.    Indeed, baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe.  Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food.  Ex. 1 at 6.

40.    Defendant preys on these interests by representing, *inter alia*, that its products are "superfood," "organic," "gluten free," and that they contain nutritious ingredients "to support brain and eye health."  For example, this is the label consumers see on Defendant's Happy Baby Apple & Broccoli Puffs:



41.    Defendant's description of this product further highlights its purported positive nutritional content and health effects, claiming that the product is "made with organic apples and sweetened with 100% fruit juice.  Each serving delivers 20 mg of choline for healthy brain development, along with nutrients like vitamins C and D and the B complex.  Happy Baby Organic Superfood Puffs have half the sugar of other puffs."[3]

42.    The Nurture HappyBaby puff products are especially misleading to consumers because of the many descriptors on the packaging suggesting the good nutrition of the product.

---

[3]    https://www.swansonvitamins.com/Happy          Baby-organic-apple-puffs-2-1-oz-pkg?SourceCode=INTL4071&showPopup=f&DFA=1&UTM_Medium=Shopping&UTM_Source=GOOGLE&UTM_Campaign=SWAN_National_Gen_Shopping_Null_Null_Childrens_Health _Smart+Childrens+Health&UTM_Content=PRODUCT_GROUP&SourceCode=INTL4071&gcl id=Cj0KCQiApY6BBhCsARIsAOI_GjaHirsW7t6d99yxvj5GIpCOx_5FCurTSiD3HcX0KxK0Y iay-g29d5gaAs2SEALw_wcB (last visited February 10, 2021).

43.     The puffs are labeled as "veggie, fruit & grain puffs" or "organic grain snack" and "superfood puffs".  Each variation of the puffs product highlights the fruit and vegetable content with titles such as "apple & broccoli" or "purple carrot & blueberry", etc., and photos of the identified fruits and vegetables.

44.     Additionally, the product packaging includes the designation "organic" no fewer than two times and emphasizes the product's "20 mg choline to support brain & eye health".  More health claims are made on the back of the packaging touting, *inter alia*, the antioxidant and vitamin content of the puffs.

45.     Additionally, unlike rice cereal, the puffs are not marketed as rice based. The are no images of rice on the packaging and the word "rice" does not even appear on the front of the packaging label.  Therefore, even if a consumer were privy to concerns about the arsenic content of rice, there is nothing beyond the small-print ingredient list to even indicate that the product contains rice.

**CLASS ACTION ALLEGATIONS**

46.     Plaintiffs bring this action individually, and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.  The class definition(s) may depend upon the information revealed through discovery.  Notwithstanding, at this time, Plaintiffs bring this action and seek certification of the following proposed Class: All persons within the United States who purchased the Products from the beginning of any applicable limitations period through the date of class certification (the "**National Class**").

47.     Plaintiff Erin Wood (the "**Texas Plaintiff**") also seeks certification of the following subclass: All persons in the State of Texas who purchased  the Products from the beginning of any applicable limitations period through the date of class certification (the "**Texas Subclass**").

48.     Plaintiff Brittian Warner (the "**Indiana Plaintiff**") also seeks certification of the following subclass: All persons in the State of Indiana who purchased the Products from the beginning of any applicable limitations period through the date of class certification (the "**Indiana Class**").

49.     Excluded from the proposed classes are Defendant, and any entities in which the Defendant has a controlling interest; Defendant's agents, employees and their legal representatives; any judge to whom this action is assigned and any member of such judge's staff and immediate family; and Plaintiffs' counsel, their staff members, and their immediate family.

50.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

51.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of the classes are so numerous that their individual joinder herein is impracticable.  Upon information and belief, members of the classes number in the thousands, to tens of thousands, or more.  The number of members in the classes is presently unknown to Plaintiffs, but may be verified by Defendant's sales and business records.  Members of the classes may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

52.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2), (b)(3).**  Common questions of law and fact exist as to all members of the classes and predominate over questions affecting only individual members of the classes.  Such common questions of law or fact include, but are not limited to, the following:

    a.   Whether the Products contain dangerous levels of Heavy Metals;

b.  Whether Defendant's marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive;

c.  Whether Defendant's actions and Products violate the state consumer fraud statutes invoked below;

d.  Whether Defendant breached implied warranties;

e.  Whether Plaintiffs and members of the classes were damaged by Defendant's conduct;

f.  Whether Defendant was unjustly enriched at the expense of Plaintiffs and members of the classes; and

g.  Whether Plaintiffs and members of the classes are entitled to injunctive relief.

53.    **Typicality—Federal Rule of Civil Procedure 23(a)(3):** The claims of the named Plaintiffs are typical of the claims of other members of the classes.  All members of the classes were comparably injured by Defendant's conduct described herein, and there are no defenses available to Defendant that are unique to Plaintiffs or any particular member of the classes.

54.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of other members of the classes.  Plaintiffs have retained class counsel competent to, and experienced in, prosecuting consumer fraud class action and who are financially able to represent the classes.

55.    **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and other members of the classes, thereby making appropriate final injunctive and declaratory relief, as described herein, with respect to members of the classes as a whole.  Specifically, Plaintiffs seek

to certify a class to enjoin Defendant from selling or otherwise distributing baby food with deceptive labeling, including requiring Defendant to disclose the presence and levels of Heavy Metals contained in its products.

56.    **Superiority—Federal Rule of Civil Procedure 23(b)(3).**   A class action is superior to any other means of adjudication for this controversy.  It would be impracticable for members of the classes to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and class members are relatively small compared to the cost of individually litigating their claims.  Individual litigation would create the potential for inconsistent rulings and cause unnecessary delay and expenses for the court system.  A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

**CAUSES OF ACTION**

**COUNT I**

**Violations of Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA")**
**TEX. BUS. & COMM. CODE § 17.41, *et seq.***
**(On behalf of the Texas Class)**

57.    The Texas Plaintiff, identified above, individually and on behalf of the Texas Class, repeats and realleges the foregoing paragraphs as if fully set forth herein.

58.    As of the date of filing this Complaint, the Texas Plaintiff has sent the requisite notice to the Consumer Protection Division of the Office of the Texas Attorney General.  *Accord* TEX. BUS. & COMM. CODE § 17.501.

59.    Defendant is a "person" under the Texas DTPA.  TEX. BUS. & COMM. CODE § 17.45(3).

60.    The Texas DTPA proscribes false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.  *Id.* at § 17.46(a).

61.    Defendant engaged in false, misleading, and deceptive acts and practices in the conduct of trade and commerce by, *inter alia*, (1) representing that goods are of a particular standard, quality, or grade when they are of another; (2) advertising goods with the intent not to sell them as advertised; and (3) failing to disclose information concerning goods, which was known at the time of the transaction, and the failure to disclose such information was intended to induce the Texas Plaintiff and the Texas Class into a transaction into which they otherwise would not have entered had the information been disclosed.  TEX. BUS. & COMM. CODE § 17.46(b)(7), (9), and (24).

62.    Specifically, Defendant represented that its Products are healthy, nutritious, and support children's brain health when the Products actually contain dangerous levels of Heavy Metals which have a significant negative effect on neurodevelopment and central nervous system in children.

63.    Defendant also advertised its Products as healthy, nutritious, and supportive of children's brain health with the intent not to sell them as advertised.  Defendant knew through its internal testing that the Products it advertised and sold contained dangerous amounts of Heavy Metals at levels which exceeded its own internal standards, and every objective standard, and which are not healthy or nutritious for children and pose serious and irreversible health risks to children who ingest them.

64.    Finally, Defendant failed to disclose the fact that the Products contained dangerous levels of Heavy Metals, which was known to Defendant at the time of the transactions through Defendant's self-testing of the Products.  Defendant's failure to disclose this material information

was intended to induce the Texas Plaintiff and the Texas Class into purchasing Defendant's products.  Defendant knows that if it disclosed the amounts of Heavy Metals revealed by its self-testing to consumers, no consumer, including the Texas Plaintiff and Texas Class, would buy the Products because Heavy Metals are harmful to their children's health and development, especially at the levels present in the Products.

65.    The Texas Plaintiff and the Texas Class relied upon Defendant's advertising and labeling of the Products to their detriment.   Specifically, they relied upon Defendant's representations that the Products are safe, healthy, and supportive of their children's brain health. Their reliance was to their detriment because they purchased Defendant's Products based upon these representations, but Defendant's Products are actually dangerous to their children's health and development due to the excessive levels of Heavy Metals contained therein.  Moreover, there can be no question that the Texas Plaintiff and the Texas Class relied upon Defendant's failure to disclose the presence of dangerous levels of Heavy Metals in its Products, as no reasonable consumer would ever feed a child food that it knows contains dangerous amounts of Heavy Metals. It is inferred that the putative class members relied upon Defendant's unlawful conduct, because the acts and omissions are common and consistent with respect to all putative class members and material in that they affect their children's health. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

66.    The Texas Plaintiff and the Texas Class never would have purchased Defendant's Products had the truth been known, as there are many other options of baby foods that they can purchase that are safe, healthy, and free of dangerous levels of Heavy Metals.

67.    Further, the Texas DTPA proscribes "any unconscionable action or course of action," which it defines as "an act or practice which, to a consumer's detriment, takes advantage

of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Comm. Code §§ 17.45(5), 17.50(a)(3).

68.    Defendant's conduct in selling its Products containing dangerous levels of Heavy Metals to the Texas Plaintiff and the Texas Class is an unconscionable action or course of action. Defendant tested its Products, knew that the Products exceeded its internal limits (and every other limit set or recommended by various agencies relating to Heavy Metals), but chose to take advantage of the Texas Plaintiff's and Texas Class's lack of knowledge of the presence of the Heavy Metals in the Products they purchased to a grossly unfair degree.

69.    Defendant's false, misleading, deceptive, and unconscionable acts are a producing and proximate cause of the economic damages sustained by the Texas Plaintiff and the Texas Class.  The Texas Plaintiff and the Texas Class did not receive what they bargained for, in that Defendant represented that the Products were safe, healthy, and supportive of their children's development when, in fact, Defendant sold them Products that contain dangerous amounts of Heavy Metals that are unsafe, unhealthy, and unsupportive of their children's development.

70.    Defendant committed the acts violative of the Texas DTPA knowingly.  The House Report evidences the fact that Defendant had actual awareness that the Products it authorized for sale contained dangerous levels of Heavy Metals.  Indeed, Defendant is the one who tested the Products and authorized them for sale.  Ex. 1 at 13-15.

71.    Accordingly, the Texas Plaintiff and the Texas Class are entitled to their economic damages, in an amount to be determined at trial by a jury of their peers, their court costs and reasonable and necessary attorneys' fees, injunctive relief, and, because Defendant knowingly violated the Texas DTPA, up to three times the amount of economic damages.

## COUNT II

**Violations of Indiana Deceptive Consumer Sales Act ("IDCSA")**
**IND CODE § 24-5-0.5, *et seq.***
**(On behalf of the Indiana Class)**

72.     The Indiana Plaintiff, identified above, individually and on behalf of the Indiana
Class, repeats and realleges paragraphs 1-56 as if fully set forth herein.

73.     The IDCSA's purposes and policies are to: "(1) simplify, clarify, and modernize the
law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from
suppliers who commit deceptive and unconscionable sales acts; and (3) encourage the
development of fair consumer sales practices."  Ind. Code § 24-5-0.5-1(b).

74.     The Act expressly prohibits suppliers from "commit[ting] an unfair, abusive, or
deceptive act, omission, or practice in connection with a consumer transaction," including "both
implicit and explicit misrepresentations," that "occur[ ] before, during, or after the transaction."
*Id.* at § 24-5-0.5-3(a).

75.     Defendant is a supplier under the IDCSA because it is a seller who regularly
engages in or solicits consumer transactions and is a manufacturer, wholesaler, or retailer.  *Id.* at
§ 24-5-0.5-2.

76.     Defendant committed unfair or deceptive acts, omissions, and/or practices in
connection with consumer transactions by, *inter alia*, (1) representing that goods are of a particular
standard, quality, or grade when they are not, and Defendant knows or should reasonably know
that they are not; (2) advertising goods with the intent not to sell them as advertised; and (3) failing
to disclose information concerning goods, which was known at the time of the transaction, and the
failure to disclose such information was intended to induce the Indiana Plaintiff and the Indiana

Class into a transaction into which they otherwise would not have entered had the information been disclosed. *Id.* at § 24-5-0.5-3(a), (b)(2).

77.    Specifically, Defendant represented that its Products are healthy, nutritious, and support children's brain health when the Products actually contain dangerous levels of Heavy Metals which have a significant negative effect on neurodevelopment and central nervous system in children.

78.    Defendant also advertised its Products as healthy, nutritious, and supportive of children's brain health with the intent not to sell them as advertised. Defendant knew through its internal testing that the Products it advertised and sold contained dangerous amounts of Heavy Metals at levels which exceeded its own internal standards, and every objective standard, and which are not healthy or nutritious for children and pose serious and irreversible health risks to children who ingest them.

79.    Finally, Defendant failed to disclose the fact that the Products contained dangerous levels of Heavy Metals, which was known to Defendant at the time of the transactions through Defendant's self-testing of the Products. Defendant's failure to disclose this material information was intended to induce the Indiana Plaintiff and the Indiana Class into purchasing Defendant's products. Defendant knows that if it disclosed the amounts of Heavy Metals revealed by its self-testing to consumers, no consumer, including the Indiana Plaintiff and Indiana Class, would buy the Products because Heavy Metals are harmful to their children's health and development, especially at the levels present in the Products.

80.    The defects in the Products remain uncured after the Indiana Plaintiff provided the requisite and timely notice of such defects. Specifically, the Indiana Plaintiff provided notice to

Defendant within six (6) months of discovering such defects, which was on or around the date the House Report was published.

81.    The Indiana Plaintiff and the Indiana Class relied upon Defendant's advertising and labeling of the Products to their detriment.    Specifically, they relied upon Defendant's representations that the Products are safe, healthy, and supportive of their children's brain health. Their reliance was to their detriment because they purchased Defendant's Products based upon these representations, but Defendant's Products are actually dangerous to their children's health and development due to the excessive levels of Heavy Metals contained therein.    Further, Defendant's omission of the presence of Heavy Metals in the Products were relied upon by the Indiana and the Indiana Class because no reasonable person would purchase baby food that contain dangerous amounts of Heavy Metals to give to their children.    Finally, Defendants' deceptive acts and omissions are common to all members of the Indiana Class, including the Indiana Plaintiff. *See Skalbania v. Simmons*, 443 N.E.2d 352, 360 (Ind. App. 1982) (Indiana law accepts the rule of which holds that "if plaintiffs can prove the existence of these common representations *at trial*, an inference would arise that the representations were made to each class member and it would be unnecessary to elicit the testimony of each plaintiff."). It is inferred that the putative class members relied upon Defendant's unlawful conduct, because the acts and omissions are common and consistent with respect to all putative class members and material in that they affect their children's health. *See Ute* 406 U.S. at 153.

82.    The Indiana Plaintiff and the Indiana Class never would have purchased Defendant's Products had the truth been known, as there are many other options of baby foods that they can purchase that are safe, healthy, and free of dangerous levels of Heavy Metals.

83.     Defendant's false, misleading, deceptive, and unconscionable acts are a producing and proximate cause of the economic damages sustained by the Indiana Plaintiff and the Indiana Class.  The Indiana Plaintiff and the Indiana Class did not receive what they bargained for, in that Defendant represented that the Products were safe, healthy, and supportive of their children's development when, in fact, Defendant sold them Products that contain dangerous amounts of Heavy Metals that are unsafe, unhealthy, and unsupportive of their children's development.

84.     The Indiana Plaintiff and the Indiana Class is thus entitled to the damages they actually suffered as a result of Defendants' unlawful conduct or five hundred dollars ($500), whichever is greater.  Ind. Code § 24-5-0.5-4(a).  Further, because Defendants' conduct was willful, as described above, the Court may increase damages in an amount that does not exceed the greater of three times of actual damage suffered or one thousand dollars ($1,000). *Id.*  The Indiana Plaintiff and the Indiana class are also entitled to their reasonably attorney fees. *Id.* at 24-5-0.5-4(b).

## COUNT III

### BREACH OF IMPLIED WARRANTIES
### (Individually, and On Behalf of Both Classes and the National Class)

85.     Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

86.     Defendant is a merchant with respect to baby foods under the UCC.  U.C.C. § 2-104.  Thus, a warranty that the Products are merchantable is implied in the contract for sale of the Products. *Id.* at § 2-314.

87.     Defendant made the affirmations of fact and the promises to Plaintiffs and Class Members that the Products are healthy, safe, and nutritious through its labeling and advertising, as described above.  Plaintiffs and Class Members believed that the Products were safe, nutritious,

and healthy (i.e., that the Products were as described and conformed to Defendant's labeling and advertising and were and fit for their ordinary use and to feed their children), and purchased the Products because of such belief, because neither Plaintiffs nor Class Members would purchase baby food to feed their children that were not safe, healthy, or nutritious.

88.    Defendant breached its implied warranty of merchantability because the Products do not pass without objection in the trade of baby foods, are not fit for their ordinary purpose, and do not conform to the promise or affirmations of fact made on the container or label of the Products, as they contain dangerous levels of Heavy Metals as set forth herein and in the House Report.

89.    Defendant also breached its implied warranty of fitness for a particular purpose.  At the time the Products were sold to Plaintiffs and Class Members, Defendant had reason to know that the Products' particular purpose was for young children to ingest as food and that Plaintiffs and Class Members rely upon Defendant's skill or judgment, as a merchant of baby food products, to select or furnish suitable goods.  As set forth herein and in the House Report, Defendant breached the implied warranty of fitness for a particular purpose by selling the Products containing dangerous levels of Heavy Metals to Plaintiffs and Class Members

90.    As a result of Defendant's breach of warranties, Plaintiffs and Class Members have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented and advertised to be, and they spent money on and fed their children Products that are worthless as they contain dangerous levels of Heavy Metals and are unsafe for their children's consumption.

91.    Pursuant to UCC § 2-607(3)(a), Plaintiffs have notified Defendant of its breaches within a reasonable time after they discovered such breaches.

## COUNT IV

### UNJUST ENRICHMENT, in the alternative
### (Individually, and On Behalf of Both Classes and the National Class)

92.     Plaintiffs repeat and re-allege the allegations of paragraphs 1-56 as if fully set forth herein.

93.     By purchasing the Products, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of the purchase price of the Products.

94.     Defendant appreciated the benefit because, were consumers not to purchase the Products, which they would not have had Defendant not misrepresented the Products and otherwise had not omitted material information regarding the presence of Heavy Metals, Defendant would have not had the revenue from Plaintiffs' and Class Members' purchases.

95.     Defendant's acceptance and retention of the benefit is inequitable and unjust and violates the fundamental principles of justice, equity, and good conscience because the benefit was obtained by Defendant's unfair, deceptive, and misleading representations and omissions about the Products.

96.     Equity cannot in good conscience permit Defendant to be economically enriched for such actions at Plaintiffs' and Class Members' expense and in violation of Texas, Indiana, and the common law, and therefore restitution and/or disgorgement of such economic enrichment is required.

Dated: April 12, 2021

Respectfully submitted,

**STECKLER WAYNE COCHRAN CHERRY, PLLC**

*/s/ Bruce W. Steckler*
Bruce W. Steckler
New York No. 4863395
Stuart L. Cochran *(pro hac forthcoming)*
Texas Bar No.: 24027936
Blake E. Mattingly *(pro hac forthcoming)*
Texas Bar No.: 24104229
12720 Hillcrest Rd., Suite 1045
Dallas, Texas 75230
T: 972-387-4040
F: 972-387-4041
bruce@swclaw.com
stuart@swclaw.com
blake@swclaw.com